**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| DUSTIN WHITNEY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| REBECCA WHITNEY, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| DAVID BERNHARDT, in his official | ) | |
| capacity as Secretary of the United | ) | |
| States Department of the Interior, | ) | |
| | ) | |
| DARYL LACOUNTE, in his official | ) | Docket No.: |
| capacity as Director of the Bureau of | ) | |
| Indian Affairs, | ) | |
| | ) | |
| TARA SWEENY, in her official | ) | |
| capacity as Acting Assistant Secretary | ) | |
| for Indian Affairs, | ) | |
| | ) | |
| BUREAU OF INDIAN AFFAIRS, | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR; | ) | |
| | ) | |
| ALEX AZAR, in his official capacity | ) | |
| as Secretary of the United States | ) | |
| Department of Health and Human | ) | |
| Services, | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF HEALTH AND HUMAN SERVICES, | ) | |
| | ) | |
| PENOBSCOT NATION, | ) | |
| | ) | |
| CAROLYN ADAMS, ESQ., in her | ) | |
| official capacity as Child Protective | ) | |

Attorney, Penobscot Nation, Child Support )
and Social Services, )
)
MICHAEL AUGUSTINE, in his )
official capacity as Director, )
Penobscot Nation Child Support and )
Social Services, )
)
     and )
)
KIRK FRANCIS, in his official )
capacity as Tribal Chief, Penobscot )
Nation, )
)
          Defendants )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NOW COME the Plaintiffs, Dustin and Rebecca Whitney, by and through their attorneys, WILLEY LAW OFFICES, and hereby request that this Honorable Court grant them a permanent injunction against the Defendants, for violations of their fundamentally protected constitutional rights, as well as declaratory relief, holding the Indian Child Welfare Act (ICWA) unconstitutional, as follows:

1.     Dustin and Rebecca Whitney are the Permanency Guardians (hereinafter PG or PG's) of E.S (a 17-year-old young lady) and D.S (a 12-year-old young man), and have provided them both with a loving, safe, and permanent home.[1] The Whitney's fostered both children since they were very young, and also fostered three of the children's older siblings; the biological parents and the Penobscot Nation supported the PG.

2.     Federal law classifies E.S. and D.S as an "Indian children," however, the initial, underlying

---

[1] The Whitney's obtained the PG of E.S. and D.S. on approximately July 13, 2011; this was an order through the Maine District Court.

protective custody matter through which the Whitney's obtained the PG over the children was through the State of Maine protective custody process; the Penobscot Nation was, at all times, notified of those proceedings and had all opportunity to participate, pursuant to ICWA.

3.      The Whitney's, while originally residents of the State of Maine, fostered the children, all of whom are on the census of the Penobscot Nation. The Whitney's thereafter obtained PG of at least the two youngest children, E.S. and D.S.

4.      The Whitney's thereafter relocated to Georgia, from Maine, as Dustin Whitney had a job opportunity there that would better his family; the Whitney's gave due notice to the biological parents and the State of Maine Department of Health and Human Services (DHHS), Child and Family Services division.

5.      The Maine DHHS then filed a motion to terminate the PG; concurrently, the Penobscot Nation filed a Petition for a Preliminary Protection Order and a Complaint for Jeopardy in the Penobscot Nation Tribal Court and was granted the PPO (custody of the children on an emergency basis).

6.      The State Court denied the Penobscot Nation's Motion to Transfer jurisdiction of the matter to it, and the matter found itself in a procedural quandary.

7.      On approximately April 25, 2017, after hearing in State Court and a conference between the two courts, the State Court, by agreement of all of the parties, denied the pending motions unless they were voluntarily withdrawn, reconsidered its denial of the Penobscot Nation's Motion to transfer jurisdiction, and thereafter transferred jurisdiction to it, and made certain amendments to the PG, requiring the PG's to travel back to Maine with the children twice per year to maintain contact with the Tribe, *inter alia*.[2]

_____

[2] Because the underlying matters are protective custody matters, they are confidential by statute, and thus

8.      The Whitney's have lived in Georgia at all times since the April 25, 2017, Order of the Maine District Court, including for some period of time prior thereto; but for ICWA, jurisdiction over the children would be with the Georgia Courts. *See* Ga. Code Ann. §19-9-40 *et seq*.; *see also* 19-A M.R.S.A. §1731 *et seq*.

9.      Currently, the Whitney's are being harassed, intimidated and threatened by the Penobscot Nation with allegations of sexual abuse, that have been investigated with no findings, adamantly denied by either child, including through multiple interviews, one of which was done by a third party child advocacy center, but which the Penobscot Nation are continuing to pursue, requiring the Whitney's and the children to make multiple trips to Maine and be subject to the jurisdiction of the Penobscot Nation Tribal Court, when jurisdiction should, legally, be with the Georgia Courts.

10.     The Whitney's have been singled out because of their religious preference of Jehovah's Witness, and criticized for raising the children in this environment.

11.     The Whitney's are being singled out due to the fact that they are non-natives (*to wit* Caucasian/white).

12.     The ordeals now being suffered by the Whitney's, and the children they care for, are occurring because Congress decided in 1978 that the federal government—and, in particular, the Department of the Interior's Bureau of Indian Affairs ("BIA")—knew best how to manage the fostering and adoption/permanency guardianship of Native American children. Though the Constitution reserves domestic relations to the States, and despite the fact that Congress possesses no enumerated power to legislate in this way, Congress enacted the Indian Child Welfare Act

the Order will not be attached as an exhibit to the complaint, even a heavily redacted version, so as to not disclose any private or confidential information, even in a redacted form; if needed, a redacted copy can be filed under seal so as to protect the confidentiality of the matter to the fullest extent allowable.

("ICWA"), 25 U.S.C. §§ 1901–1963. ICWA, and the enabling regulations recently promulgated by the BIA, invade every aspect of state family law as applied to Indian children. ICWA commandeers state agencies and courts to become investigative and executive actors carrying out federal policy, and to make child custody decisions based on racial preferences.

13.     By enforcing this racially discriminatory policy, the federal government places Indian children at risk for serious and lasting harm. And States that refuse to follow ICWA risk having their child custody decisions invalidated and federal child welfare funding pulled. Thus, Congress forces ICWA on the States by threatening the stability and well-being of the family lives of their youngest and most vulnerable citizens.

14.     This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, and the United States Constitution, brought to challenge the validity of a final rule entitled *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016) (the "Final Rule") (codified at 25 C.F.R. pt. 23), and certain provisions of ICWA that the Final Rule purports to interpret and implement.

15.     ICWA's placement preferences require that, "in any adoptive placement of an Indian child under state law, a preference shall be given in absence of good cause to the contrary to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a); *see also id.* § 1915(b); 25  C.F.R. § 23.130; *id.* § 23.131. The Final Rule provides that "good cause" to depart from ICWA's "placement preferences" should be shown by "clear and convincing evidence." 25 C.F.R. § 23.132. And ICWA further provides that any adoption of Indian child is subject for two years to collateral attack on  the ground that the parent's consent "was obtained through fraud or duress." 25 U.S.C. §1913(d).

16.     ICWA ultimately strips States that have adopted the Uniform Child Custody and

Jurisdiction Act (UCCJEA), of retaining jurisdiction over their citizens in the event that those parents, whether adoptive or permanency guardian, have custody of an Indian child. *See* 25 U.S.C. §§1918 – 1919; 25 C.F.R. §§ 23.1115 – 23.119; *see also* Ga. Code Ann. §19-9-40 *et seq.*; 19-A M.R.S.A. §1731 *et seq.*

17.     Plaintiffs bring this action because ICWA and the Final Rule expose them of continued, unfettered attack by the Penobscot Nation, when they reside thousands of miles away, in another State and shouldn't be subject to continued jurisdiction in Maine or the Penobscot Nation.[3]

18.     The Whitney's cannot challenge the Final Rule under the APA in state court proceedings, because any such action must be brought in a "court of the United States." 5 U.S.C. § 702.

19.     Plaintiffs bring this action because ICWA and the Final Rule intrude upon the States' sovereign authority over domestic relations in every child custody proceeding, because ICWA demands that Maine's child welfare agencies and courts inquire about Indian children in every foster care, preadoptive, or adoption/permanent guardianship proceeding. ICWA also commandeers States to perform executive branch functions and apply racially discriminatory preferences. Moreover, Defendants threaten to strip States of child welfare, foster care, and adoption services funding administered by the Department of Health and Human Services ("HHS") if they do not comply with ICWA's mandates. 42 U.S.C. §§ 622(b)(9), 677(b)(3)(G).

20.     ICWA directs that no State can take jurisdiction over an Indian child within its borders, based purely on a racial determination.

21.     Plaintiffs thus bring this action for declaratory and injunctive relief and pray that this Court:

---

[3] The Whitney's had interest in adopting the children, however, the Penobscot Nation opposed the State's Motion to Terminate the Parental Rights of the bio-parents, but the Penobscot Nation did support a Permanency Guardianship.

(1) vacate and set aside the Final Rule; (2) declare that Sections 1901–1923 and 1951– 1952 of ICWA violate the Constitution; (3) declare that Sections 1911, 1912, 1913(d), 1914, and 1915 of ICWA violate the Constitution; (4) declare that Sections 622(b)(9) and 677(b)(3)G) of the Social Security Act violate the Constitution; (5) enjoin the defendants from implementing or administering Sections 1901–1923 and 1951–1952 of ICWA; (6) enjoin the defendants from implementing or administering Sections 19,11, 1912, 1913(d), 1914, or 1915 of ICWA; and (7) enjoin the defendants from implementing or administering Sections 622(b)(9) and 677(b)(3)G) of the Social Security Act.

**PARTIES**

22.    Plaintiffs Dustin and Rebecca Whitney are the Permanency Guardians of two Indian children, E.S. and D.S. Neither Mr. Whitney nor Mrs. Whitney is "a member of an Indian tribe," 25 U.S.C. § 1903(3), and therefore the Whitney's are not an "Indian family" within the meaning of ICWA and the Final Rule.

23.    Defendant United States of America is sued under 28 U.S.C. § 1346.

24.    Defendant David Bernhardt is the Secretary of the United States Department of the Interior. He is sued in his official capacity.

25.    Defendant Darryl LaCounte is the Director of the Bureau of Indian Affairs within the United States Department of the Interior. He is sued in his official capacity.

26.    Defendant Tara Sweeny, is the Acting Assistant Secretary for Indian Affairs at the Bureau of Indian Affairs within the United States Department of the Interior. She is sued in her official capacity.

27.    Defendant Bureau of Indian Affairs ("BIA") is a federal agency within the Department of the Interior.

28.     Defendant United States Department of the Interior (the "Interior") is a federal executive department of the United States.

29.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services. He is sued in his official capacity.

30.     Defendant United States Department of Health and Human Services ("HHS") is a federal executive department of the United States.

31.     Defendant Penobscot Nation is a duly recognized Tribe of the United States, with its principal location on Indian Island, Penobscot County, Maine.

32.     Defendant Carolyn Adams, Esq., is the attorney for the Penobscot Nation Child Support and Social Services. She is sued in her official capacity.

33.     Michael Augustine is the Director, Child Support and Family Services for the Penobscot Nation. He is sued in his official capacity.

34.     Kirk Francis is the Tribal Chief, Penobscot Nation. He is sued in his official capacity.

**JURISDICTION AND VENUE**

35.     This action arises under the APA and the United States Constitution. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question),  28 U.S.C. § 1346 (United States defendant), and 5 U.S.C. §§ 701–706 (review of agency action). This Court has authority to award the requested declaratory and injunctive relief, 28 U.S.C. §§ 2201– 02, and costs and attorneys' fees, 28 U.S.C. § 2412.

36.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(l) as this is an action against officers and agencies of the United States, a substantial part of the events giving rise to this claim occurred in this district, and no real property is involved in the action.

**ALLEGATIONS**

## I.      THE STATUTORY AND REGULATORY FRAMEWORK

### A.      State Power Over Domestic Relations

37.      With few exceptions, regulation of domestic relations is an area of law over which the States possess exclusive power. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975). "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *Ex parte Burrus*, 136 U.S. 586, 593–94 (1890).

38.      The power of States over domestic relations is so well-settled that federal courts lack Article III jurisdiction over domestic relations issues, and child custody disputes in particular. *Burrus*, 136 U.S. at 594.

39.      All States regulate domestic relations, including marriage, divorce, adoption, and the rights and responsibilities of parents and children.

40.      For example, Maine regulates the domestic relations of individuals domiciled within its borders. Title 19-A of the Maine Revised Statutes regulates the formation and dissolution of marriage and marital property rights. 19-A M.R.S.A. §§601 – 1051. 19-A M.R.S.A. §§1651 – 1659 regulates the status of children in relation to their parents. 19-A M.R.S.A. §§1801 – 1806 regulates the rights of grandparents to have rights to their grandchildren. 19-A M.R.S.A. §§4001 – 4014 protect Maine families from domestic violence. 19-A M.R.S.A. §§1731 – 1783 regulates Maine Courts jurisdiction over children in the State.  Title 22 also regulates the parent-child relationship, including termination of parental rights, foster care, and adoption. 22 M.R.S.A. §4001 *et seq*.

41.      Maine recognizes the "best interest of the child" as the "primary consideration" for courts when determining parentage, possession, and access to the child. 19-A M.R.S.A. §1653(3); *see also* 22 M.R.S.A. §4036-B (2). Maine's fundamental interest in parental-rights termination cases is to protect the best interest of the child. *See In re Children of Melissa F.*, 2018 ME 110, ¶ 13, 191

A.3d 348 ("As for the best interests of the children, the clear preference of the Legislature, as evinced by 22 M.R.S. § 4050 (2017), is to [e]liminate the need for children to wait unreasonable periods of time for their parents to correct the conditions which prevent their return to the family and to [p]romote the adoption of children into stable families.").

42.     In Maine, the best interest of the child standard is aligned with another of the child's interests—an interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged. *Id.* The Maine Probate Code further protects the parent-child bond and the health of adoptive children by providing that "[a] court may, on petition filed within one year of the decree of adoption and after notice and hearing, reverse and annul an adoption decree based on findings by clear and convincing evidence that the adoption was obtained as a result of fraud, duress or illegal procedures. 18-C M.R.S.A. §9-135.

43.     Maine State Law and Georgia State Law, regulating families and children, are significantly affected by ICWA. *See e.g.* Ga. Code Ann. §19-9-40 *et seq*.; 19-A M.R.S.A. §1731 *et seq*.; *see also* 18-C M.R.S.A. §9-107; 22 M.R.S.A. §§4008(2)(I), 4062(1), 7805 (exempting any Tribe from having to obtain State licensing for facilities housing adults or children) and 8101 (defining children's homes).

44.     ICWA and the Final Rule alter the application of State family law to Indian children and impose significant delays on permanency for those children, as well as undue, long term jurisdictional issues, particularly on non-Indian families who are raising Indian children who do not reside in the same State where the Tribe/Nation is located.

**B.     The Indian Child Welfare Act**

45.     In the mid-1970s, there was rising concern over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through

adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). "Congress found that 'an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'" *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2557 (2013) (quoting 25 U.S.C. § 1901(4)). "This wholesale removal of Indian children from their homes prompted Congress" to enact ICWA, 25 U.S.C. §§ 1901–1963. *Id.*

46.    ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." 25 U.S.C. § 1902. An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4).

47.    ICWA mandates placement preferences in foster care, preadoptive, and adoptive proceedings involving Indian children. 25 U.S.C. § 1915.

48.    "In any adoptive placement under State law," ICWA mandates that, "in the absence of good cause to the contrary," "preference shall be given . . . to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a).

49.    ICWA similarly requires that "in any foster care or preadoptive placement preference shall be given, in the absence of good cause to the contrary, to placement with – (i) a member of the child's extended family; (ii) a foster home . . . specified by the Indian child's tribe; (iii) an Indian foster home . . . approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian tribe." 25 U.S.C. § 1915(b).

50.    ICWA requires state agencies and courts to defer to the alteration of the preferences

established by Section 1915(a)–(b), if the Indian child's tribe establishes a different order of preference by resolution. 25 U.S.C. § 1915(c).

51.     ICWA places an affirmative duty on state agencies and courts to notify potential intervenors and the federal government about an Indian child matter. 25 U.S.C. § 1912.

52.     In any involuntary child custody proceeding, ICWA commands state agencies and courts, when seeking foster care placement of, or termination of parental rights to, an Indian child, to notify the parents or Indian custodian and the Indian child's tribe of the pending proceedings and of their right to intervention under 25 U.S.C. § 1911(c). 25 U.S.C. § 1912(a); 25 C.F.R. § 23.11. Copies of these notices must be sent to the Secretary and the BIA. 25 C.F.R. § 23.11. No foster care placement or termination of parental rights proceeding may be held until at least ten days after receipt of the notice by the parent or Indian custodian and tribe or the Secretary.  25 U.S.C. § 1912(a). ICWA grants the Indian custodian or tribe up to twenty additional days to prepare for such proceedings. *Id*.

53.     ICWA demands that state agencies and courts undertake additional duties and costs to implement its federal program.

54.     ICWA requires state agencies charged with serving children in foster care and adoption proceedings to use "active efforts" to prevent the breakup of the family. "Any party [including state agencies] seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proven unsuccessful." 25 U.S.C. § 1912(d).

55.     ICWA requires state courts to apply federal substantive rules of decision and federal procedural requirements in state law causes of action that result in state law judgments.

56.     ICWA requires foster care placement and termination of parental rights proceedings, in the absence of good cause to the contrary, to be transferred to tribal courts for an Indian child, even if he or she is not domiciled or residing on the reservation. 25 U.S.C. § 1911(b).

57.     ICWA commands state courts to grant mandatory intervention to an Indian custodian and the child's tribe at any point in the proceedings. 25 U.S.C. § 1911(c).

58.     ICWA prohibits the termination of parental rights for an Indian child in the absence of "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). The BIA is not required to pay for the services of expert witnesses. 25 C.F.R. § 23.81.

59.     ICWA dictates when a parent or Indian custodian may consent to a foster care placement or termination of parental rights, "[a]ny consent given prior to, or within ten days after, birth of the Indian child shall not be valid." 25 U.S.C. § 1913(a). "Any parent or Indian custodian may withdraw consent to a foster care placement under State law at any time and, upon such withdrawal, the child shall be returned to the parent or Indian custodian." *Id*. § 1913(b). And "[i]n any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent." *Id*. § 1913(c).

60.     ICWA permits the parent of an Indian child to withdraw consent to a final decree of adoption on the grounds that the consent was obtained through fraud or duress, and upon finding fraud or duress, a state court must vacate the final decree and return the child to the parent. The parent may withdraw consent based on fraud or duress for up to two years after the final judgment

of adoption. 25 U.S.C. § 1913(d).

61.     ICWA places recordkeeping duties on state agencies and courts.

62.     State agencies and courts must maintain records demonstrating their compliance with the statute. "A record of each such placement, under State law, of an Indian child shall be maintained by the State in which the placement was made, evidencing the efforts to comply with the order of preference specified in this section. Such record shall be made available at any time upon the request of the Secretary or the Indian child's tribe." 25 U.S.C. § 1915(e).

63.     State courts must maintain records and report to the Indian child his or her tribal affiliation once that child reaches age eighteen. "Upon application by an Indian individual who has reached the age of eighteen and who was the subject of an adoptive placement, the court which entered the final decree shall inform such individual of the tribal affiliation, if any, of the individual's biological parents and provide such other information as may be necessary to protect any rights flowing from the individual's tribal relationship." 25 U.S.C. § 1917.

64.     State courts entering final decrees or orders in an Indian child adoption case must provide the Secretary with a copy of the decree or order, along with the name and tribal affiliation of the child, names of the biological parents, names of the adoptive parents, and the identity of any agency having files or information relating to the adoption. 25 U.S.C. § 1951.

65.     Failure to comply with ICWA may result in final child custody orders or placements to be overturned on appeal or by another court of competent jurisdiction. 25 U.S.C. § 1914.

66.     ICWA also overrides the provisions of state law that promote finality in adoptions by allowing an adoption order to come under collateral attack for up to two years after entry of the order. 25 U.S.C. § 1913(d).

67.     ICWA prohibits a State from asserting jurisdiction over an Indian child living within its

borders, regardless of where the Tribe is located.

68.     ICWA ensures state agencies and courts comply with its mandates by enabling any Indian child who is the subject of any action for foster care placement or termination of parental rights under state law, any parent or Indian custodian from whose custody the child was removed, and the Indian child's tribe to petition any court of competent jurisdiction to invalidate a state court's decision for failure to comply with ICWA sections 1911, 1912, and 1913. 25 U.S.C. § 1914. Section 1914 has also been applied to allow collateral attacks to adoptions after the close of the relevant window under state law. *See, e.g.*, *Belinda K. v. Baldovinos*, No. 10-cv-2507, 2012 WL 13571, at *4 (N.D. Cal. Jan. 4, 2012).

69.     In 1994, Congress enacted another mechanism to coerce States to comply with ICWA. The Social Security Act Amendments of 1994 require states who receive child welfare services program funding through Title IV-B, Part 1 of the Social Security Act to file annual reports detailing their compliance with ICWA. Pub. L. No. 103–432, § 204, 108 Stat. 4398 (1994). According to Title IV-B:

(a)     In order to be eligible for payment under this subpart, a State must have a plan for child welfare services which has been developed jointly by the Secretary and the State agency designated pursuant to subsection (b)(1), and which meets the requirements of subsection (b).

(b)     Each plan for child welfare services under this subpart shall— . . . (9) contain a description, developed after consultation with tribal organizations (as defined in section 4 of the Indian Self-Determination and Education Assistance Act) in the State, of the specific measures taken by the State to comply with the Indian Child Welfare Act.

42 U.S.C. § 622.

70.     States can use Title IV-B funding for a variety of child welfare services, including family preservation, family reunification, services for foster and adopted children, training for child welfare professionals, and adoption promotion activities.

71.     HHS and Secretary Azar shall pay each State that has developed a plan in accordance with

section 622. 42 U.S.C. § 624(a). However, "[i]f the Secretary determines that a State has failed to comply with subparagraph (a) for a fiscal year, then the percentage that would otherwise apply for purposes of subsection (a) for the fiscal year shall be reduced by" a certain amount. *Id*. § 624(f)(2)(B).

72.     Each State receives a base amount of $70,000 in Title IV-B funding. 42 U.S.C. § 623(a). Additional funds are distributed in proportion to the State's population of children under age 21 multiplied by the complement of the State's average per capita income.

73.     Congress expanded the requirement for States to comply with ICWA to receive Social Security Act funding in 1999 and 2008, when it amended Title IV-E of the Social Security Act to require States to certify ICWA compliance to receive foster care and adoption services funding. Foster Care Independence Act of 1999, Pub. L. No. 106–169, § 101, 113 Stat. 1822 (1999); Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110- 351, § 301, 122 Stat. 3949 (2008). According to Title IV-E:

(1) A State may apply for funds from its allotment under subsection (c) of this section for a period of five consecutive fiscal years by submitting to the Secretary, in writing, a plan that meets the requirements of paragraph (2) and the certifications required by paragraph (3) with respect to the plan.

…

(3) Certifications

The certifications required by this paragraph with respect to a plan are the following:

…

(G) A certification by the chief executive officer of the State that each Indian tribe in the State has been consulted about the programs to be carried out under the plan; that there have been efforts to coordinate the programs with such tribes; that benefits and services under the programs will be made available to Indian children in the State on the same basis as to other children in the State; and that the State will negotiate in good faith with any Indian tribe, tribal organization, or tribal consortium in the State that does not receive an allotment under subsection (j)(4) for a fiscal year and that requests to develop an agreement with the State to administer, supervise, or oversee the programs to be carried

out under the plan with respect to the Indian children who are eligible for such programs and who are under the authority of the tribe, organization, or consortium and to receive from the State an appropriate portion of the State allotment under subsection (c) for the cost of such ad- ministration, supervision, or oversight.

42 U.S.C. § 677(b).

74.    HHS regulations state that the HHS Administration for Children and Families ("ACF")

"will determine a title IV–E agency's substantial conformity with title IV–B and title IV– E plan

requirements" based on "criteria related to outcomes." 45 C.F.R. § 1355.34(a).

75.    "Criteria related to outcomes" includes:

(2)    A title IV–E agency's level of achievement with regard to each outcome reflects the extent to which a title IV–E agency has:

(i)    Met the national standard(s) for the statewide/Tribal service area data indicator(s) associated with that outcome, if applicable; and,

(ii)    Implemented the following [Child and Family Services Plan] CFSP requirements or assurances:

(E) The requirements in section 422(b)(9) of the Act regarding the State's compliance with the Indian Child Welfare Act.

45 C.F.R. § 1355.34(b).

76.    HHS and Secretary Azar withhold funds for failure to comply with Title IV-B and IV-E

requirements, including failure to comply with and implement ICWA by State agencies and courts.

45 C.F.R. § 1355.36.

77.    In Fiscal Year 2016, Maine was appropriated approximately $32,724,287.00 million in

federal funding for Title IV-B and Title IV-E programs.

78.    Titles IV-B and IV-E vest Secretary Azar with discretion to approve or deny a State's

compliance with the requirements of 42 U.S.C. §§ 622, 677.

79.    HHS and Secretary Azar administer funding under Titles IV-B and IV-E of the Social

Security Act.

80.      Defendants enforce compliance with 42 U.S.C. § 622(b)(9), 677(b)(3)(G) and will reduce or deny funding to States that do not comply with ICWA.

**C.      The 1979 BIA Guidelines**

81.      Soon after ICWA's enactment, the BIA promulgated "Guidelines for State Courts; Indian Child Custody Proceedings" (the "1979 Guidelines") that were intended to assist the implementation of ICWA, but were "not intended to have binding legislative effect." 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979). The 1979 Guidelines recognized that "[p]rimary responsibility" for interpreting ICWA "rests with the courts that decide Indian child custody cases." *Id*. The 1979 Guidelines emphasized that "the legislative history of the Act states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.*

82.      As state courts applied ICWA in the ensuing decades, most held that the "good cause" exception to ICWA's placement preferences requires a consideration of the child's best interests, including any bond or attachment the child had formed with her current caregivers. *See, e.g.*, *In re Interest of Bird Head*, 331 N.W.2d 785, 791 (Neb. 1983); *In re Appeal in Maricopa Cty. Juvenile Action No. A-25525*, 667 P.2d 228, 234 (Ariz. Ct. App. 1983); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 307–08 (Ind. 1988); *In re Adoption of M.*, 832 P.2d 518, 522 (Wash. Ct. App. 1992); *In re Adoption of F.H.*, 851 P.2d 1361,1363–64 (Alaska 1993); *In re Interest of A.E., J.E., S.E., and X.E.*, 572 N.W.2d 579, 583–85 (Iowa 1997); *People ex rel. A.N.W.*, 976 P.2d 365, 369 (Colo. Ct. App. 1999); *In re Interest of C.G.L.*, 63 S.W.3d 693, 697–98 (Mo. Ct. App. 2002); *In re Adoption of Baby Girl B.*, 67 P.3d 359, 370–71 (Okla. Ct. App. 2003); *but see Yavapai–Apache Tribe v. Mejia*, 906 S.W.2d 152 (Tex. App.—Houston [14th Dist.] Aug. 24, 1995, no pet.).

83.      Other state courts, developing and applying the "existing Indian family doctrine," limited

ICWA's application to circumstances where the child had some significant political or cultural connection to the tribe. *See, e.g.*, *In re Interest of S.A.M*, 703 S.W.2d 603, 608–09 (Mo. Ct. App. 1986); *Claymore v. Serr*, 405 N.W.2d 650, 653-54 (S.D. 1987); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind. 1988); *Hampton v. J.A.L.*, 658 So. 2d 331, 335 (La. Ct. App. 1995); *Rye v. Weasel*, 934 S.W.2d 257, 261–64 (Ky. 1996); *In re Santos Y.*, 112 Cal. Rptr. 2d 692, 716 n.16 (Cal. App. 2001); *In re Morgan*, No. 02A01-9608-CH-00206, 1997 WL 716880, at *1 (Tenn. Ct. App. Nov. 19, 1997); *Ex parte C.L.J.*, 946 So. 2d 880 (Ala. Civ. App. 2006); *In re N.J.*, 221 P.3d 1255, 1264–65 (Nev. 2009). The existing Indian family doctrine is premised, in part, on the significant equal protection concerns that would arise if ICWA applied to children with no political or cultural connection to a tribe based solely on the child's ancestry. *See In re Bridget R.*, 49 Cal. Rpt. 2d 507, 527–29 (Cal. App. 1996); *cf. Adoptive Couple,* 133 S. Ct. at 2565 (noting that interpreting ICWA's parental termination provisions as applicable in any case where a child has an Indian ancestor, "even a remote one, . . . would raise equal protection concerns").

**D.    The Final Rule**

84.    In June 2016, almost four decades after ICWA's passage, the BIA promulgated *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016) (the "Final Rule") (codified at 25 C.F.R. pt. 23). The Final Rule purports to "clarify the minimum Federal standards governing implementation of the Indian Child Welfare Act" and to ensure that the Act "is applied in all States consistent with the Act's express language." 25 C.F.R. § 23.101.

85.    The BIA characterizes the Final Rule as a "legislative rule" that "set[s] binding standards for Indian child custody proceedings in State courts" and is "entitled to *Chevron* deference." 81 Fed. Reg. at 38,782, 38,786, 38,788.

86.    The Final Rule provides the "minimum Federal standards governing implementation" of

ICWA, 25 C.F.R. § 23.101, and "to ensure compliance with ICWA," *id.* § 23.106(a).

87.     The Final Rule requires state agencies and courts to conduct Executive Branch investigations and duties.

88.     The Final Rule requires "State courts [to] ask each participant in an emergency or voluntary or involuntary child custody proceeding whether the participant knows or has reason to know that the child is an Indian child." 25 C.F.R. § 23.107(a). These inquiries "should be on the record," and "State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." *Id.*

89.     When the state agency or court believes the child is an Indian child, the court must confirm, through "a report, declaration, or testimony included in the record," that the state agency or other party used due diligence to identify and work with all of the tribes of which there is reason to know the child may be a member (or eligible for membership). 25 C.F.R. § 23.107(b). The Final Rule specifies that the state court must confirm that the state agency conducted a "diligent search . . . to find suitable placements meeting the preference criteria." *Id.* § 23.132(c)(5).

90.     The Final Rule dictates to state agencies and courts when and how notice of an involuntary foster care placement or termination of parental rights proceeding involving an Indian child must be provided to an Indian tribe, the child's parents, and the child's Indian custodian. 25 C.F.R. § 23.111. The Final Rule prohibits the continuation of foster care placement or termination of parental rights proceedings in state courts until at least 10 days after receipt of the notice by the parent or Indian custodian and by the tribe or Secretary of the Interior. 25 C.F.R. § 23.112. Upon request, the state court must grant the parent, Indian custodian, or tribe up to 20 additional days from the date upon which notice was received to prepare for the hearing. *Id.*

91.     The Final Rule prescribes how a state court may proceed with an emergency removal or

placement of an Indian child, including when to hold a hearing, how to notify the Indian child's custodians, how to make a court record of the proceedings, what evidence must be provided to the court, and when to end the proceeding. 25 C.F.R. § 23.113.

92.     In an involuntary foster care or termination of parental rights proceeding, the Final Rule requires state courts to ensure and document that the state agency has used "active efforts" to prevent the breakup of the Indian family. 25 C.F.R. § 23.120.

93.     The Final Rule defines "active efforts" to include "assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." 25 C.F.R. § 23.2. "To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe." *Id*.

94.     State agencies must tailor active efforts to the facts and circumstances of the case, which may include, for example:

(1)     Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

(2)     Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

(3)     Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

(4)     Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

(5)     Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

(6)      Taking steps to keep siblings together whenever possible;

(7)      Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8)      Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9)      Monitoring progress and participation in services;

(10)     Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

(11)     Providing post-reunification services and monitoring. 25 C.F.R. § 23.2.

95.      The Final Rule requires state courts to apply federal substantive rules of decision and federal procedural requirements in state law causes of action that result in state law judgments.

96.      Only the Indian tribe of which it is believed the child is a member (or eligible for membership) may determine whether the child is a member of the tribe or eligible for membership. 25 C.F.R. § 23.108(a). "The State court may not substitute its own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe." *Id*. § 23.108(b).

97.      When an Indian child is a member or eligible for membership in only one tribe, that tribe must be designated as the Indian child's tribe. But when the child meets the definition of "Indian child" for more than one tribe, then the Final Rule instructs state agencies and courts to defer to "the Tribe in which the Indian child is already a member, unless otherwise agreed to by the Tribes," or allow "the Tribes to determine which should be designated as the Indian child's Tribe." *Id*. § 23.109(b)–(c). Only when the tribes disagree about the child's membership may the state courts designate the tribe to which the child belongs, and the Final Rule provides criteria the courts must use in making that designation. *Id*. § 23.109(c)(2).

98.     The Final Rule instructs state courts that they must dismiss a voluntary or involuntary child custody proceeding when the Indian child's residence or domicile is on a reservation where the tribe exercises exclusive jurisdiction over child custody proceedings. 25 C.F.R. § 23.110(a).

99.     The Final Rule requires state courts to terminate child custody proceedings if any party or the court has reason to believe that the Indian child was improperly removed from the custody of his parent or Indian custodian. 25 C.F.R. § 23.114.

100.     The Final Rule instructs state agencies and courts on how to transfer proceedings to tribal courts. The parent, Indian custodian, or the Indian child's tribe may request transfer at any time, orally or in writing. 25 C.F.R. § 23.115. The Final Rule then requires the state court to promptly notify the tribal court in writing of the transfer petition, and it must transfer the proceeding, unless either parent objects, the tribal court declines the transfer, or good cause exists for denying the transfer. 25 C.F.R. § 23.116–117. The Final Rule establishes when good cause exists to deny the transfer. 25 C.F.R. § 23.118. If the tribal court accepts the transfer, the Final Rule instructs that the state court should expeditiously provide the tribal court with all records related to the proceeding. 25 C.F.R. § 23.119.

101.     The Final Rule prohibits state courts from ordering a foster care placement of an Indian child unless clear and convincing evidence is presented, including expert testimony, demonstrating that the child is in serious emotional or physical danger in the parent's or Indian custodian's custody. 25 C.F.R. § 23.121(a).

102.     The Final Rule prohibits state courts from terminating parental rights for an Indian child unless evidence beyond a reasonable doubt is presented, including expert testimony, that the child is in serious emotional or physical danger. 25 C.F.R. § 23.121(b). The evidence must demonstrate a causal relationship between the conditions in the home and the likelihood of danger to the child.

25 C.F.R. § 23.121(c)–(d). The Final Rule prohibits the state agency caseworker from serving as an expert witness, and dictates that the Indian child's tribe will designate the expert witness. 25 C.F.R. § 23.122.

103.    In voluntary child custody proceedings, the Final Rule mandates that state courts require the participants to state on the record whether the child is an Indian child, or whether they have reason to believe the child is an Indian child. 25 C.F.R. § 23.124(a). "If there is reason to believe the child is an Indian child, the State court must ensure that the party seeking placement has taken all reasonable steps to verify the child's status," including "contacting the Tribe of which it is believed the child is a member (or eligible for membership and of which the biological parent is a member) to verify the child's status." *Id*. § 23.124(b).

104.    The Final Rule describes what evidence a state court may consider when evaluating the voluntary consent for termination of parental rights, foster care, preadoptive, and adoptive placement by a parent or Indian custodian. 25 C.F.R. § 23.125. For foster care placement, consent may be withdrawn at any time. 25 C.F.R. § 23.125(b)(2)(i). For termination of parental rights and adoption, consent may be withdrawn any time prior to the final decree of termination or adoption. 25 C.F.R. § 23.125(b)(2)(ii)–(iii). Consent given prior to, or within 10 days after, the birth of an Indian child is not valid. 25 C.F.R. § 23.125(e). The Final Rule also dictates what information written consent must contain, 25 C.F.R. § 23.126, and how a parent or custodian may withdraw consent, 25 C.F.R. § 23.127–28.

105.    The Final Rule requires state agencies and courts to follow placement preferences based on the child's Indian parentage.

106.    In adoptive placements "preference must be given in descending order . . . to placement of the child with: (1) A member of the Indian child's extended family; (2) Other members of the Indian

child's Tribe; or (3) Other Indian families." 25 C.F.R. § 23.130(a).

107.    "If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply." *Id.* § 23.130(b).

108.    In other words, in adoptive placement proceedings, the tribe designated as the Indian child's tribe may enact a resolution that prefers placement with another Indian family of an- other tribe, even if the Indian child has extended family with which he or she may be placed.

109.    In foster care or preadoptive placement proceedings, "preference must be given . . . to placement of the child with: (1) A member of the Indian child's extended family; (2) A foster home that is licensed, approved, or specified by the Indian child's Tribe; (3) An Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (4) An institution for children approved by an Indian Tribe or operated by an Indian organization which has a program suitable to meet the child's needs." 25 C.F.R. § 23.131(b).

110.    "If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply, so long as the placement is the least-restrictive setting appropriate to the particular needs of the Indian child." *Id.* § 23.131(c).

111.    In other words, in foster care and preadoptive placement proceedings, the tribe designated as the Indian child's tribe may enact a resolution that prefers placement with an institution for children approved by another Indian organization, even if the Indian child has extended family with which he or she may be placed.

112.    The Final Rule further requires that the State undertake "a diligent search to find suitable placements meeting the preference criteria." 25 C.F.R. § 23.132(c)(5). The Final Rule also demands that the State may not assess the availability of a preferred placement according to generally applicable standards under state law, but instead must adhere to "the prevailing social and cultural

standards of the Indian community in which the Indian child's parent or extended family resides or with which the Indian child's parent or extended family members maintain social and cultural ties." *Id.*

113.    The "diligent search" requirement usurps the State's authority to assess potential placements under the standards of the State, and instead requires the State to expend significant efforts to locate placements that conform to the Tribe's view of suitability. Because the State must adopt the Tribe's standard of suitability, the Final Rule blocks the State from seeking to promote the best interests of the child.

114.    A state court may depart from the placement preferences contained in Sections 23.130–131 of the Final Rule if there is "good cause." 25 C.F.R. § 23.132. The Final Rule prescribes circumstances in which the "good cause" standard is met. *Id.*

115.    After observing that "State courts . . . differ as to what constitutes 'good cause' for departing from ICWA's placement preferences," 81 Fed. Reg. at 38,782, the Final Rule newly mandates that "[t]he party urging that the ICWA preferences not be followed bears the burden of proving ***by clear and convincing evidence*** the existence of good cause" to deviate from such a placement. 81 Fed. Reg. at 38,838 (emphasis added); *see also* 25 C.F.R. § 23.132(b). Though the Final Rule says that its regulations "do not categorically require" that state courts apply a clear-and-convincing standard of proof—the regulation itself says that a party seeking departure from the placement preferences "should bear the burden of proving by clear and convincing evidence that there is good cause," 25 C.F.R. § 23.132(b)—the Final Rule simultaneously says the clear-and-convincing standard "should be followed." 81 Fed. Reg. at 38,843.

116.    The Final Rule also expressly repudiates the Existing Indian Family doctrine. *See* 81 Fed. Reg. at 38,802 ("[T]here is no [Existing Indian Family] exception to the application of ICWA.").

Accordingly, the Final Rule provides that state courts "may not consider factors such as the participation of the parents or Indian child in Tribal cultural, social, religious, or political activities, the relationship between the Indian child and his or her parents, whether the parent ever had custody of the child, or the Indian child's blood quantum." 81 Fed. Reg. at 38,868 (codified at 25 C.F.R. § 23.103(c)).

117.    And contrary to the idea—previously embraced by the BIA—that "the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child," 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979), the Final Rule now claims that "Congress intended the good cause exception to be narrow and limited in scope," 81 Fed. Reg. at 38,839. Accordingly, the Final Rule sets forth "five factors upon which courts may base a determination of good cause to deviate from the placement preferences," and further "makes clear that a court may not depart from the preferences based on the socioeconomic status of any placement relative to another placement or based on the ordinary bonding or attachment that results from time spent in a non-preferred placement that was made in violation of ICWA." 81 Fed. Reg. at 38,839; *see also* 25 C.F.R. § 23.132(c)–(e).

118.    The BIA threatens enforcement of the Final Rule through the invalidation of child custody proceedings involving Indian children that do not follow ICWA or the Final Rule's requirements.

119.    The Final Rule requires state courts to vacate adoption decrees, up to two years after their issuance, if the parents of the Indian child file a petition to vacate the order. 25 C.F.R. § 23.136. By contrast, the Maine Probate Code further protects the parent-child bond and the health of adoptive children by providing that "[a] court may, on petition filed within one year of the decree of adoption and after notice and hearing, reverse and annul an adoption decree based on findings by clear and convincing evidence that the adoption was obtained as a result of fraud, duress or

illegal procedures. 18-C M.R.S.A. §9-135.[4]

120.    The Final Rule allows an "Indian child," a parent or Indian custodian, or the child's Tribe seeking to petition a court to invalidate a foster-care placement or termination of parental rights under state law. 25 C.F.R. § 23.137. The petitioner is not required to show that her rights were violated, only that any violation of 25 U.S.C. §§ 1911–1913 occurred during the course of the challenged child-custody proceeding. *Id.*

121.    If an Indian child has been adopted, the state court must notify the child's biological parent or prior Indian custodian and the child's tribe whenever the final adoption decree has been vacated or set aside or the adoptive parent has voluntarily consented to the termination of parental rights. 25 C.F.R. § 23.139.

122.    Once an Indian child reaches age 18, the state court that entered the final adoption decree must inform that person of his or her tribal affiliation. 25 C.F.R. § 23.138.

123.    Whenever a state court enters a final adoption decree or an order in a voluntary or involuntary Indian child placement, the Final Rule requires the state court or designated state agency to provide a copy of the decree or order to the BIA within 30 days along with biographical information about the child, the biological parents, the adoptive parents, the state agency possessing information about the child, and information about tribal membership of the child. 25 C.F.R. § 23.140.

124.    The Final Rule requires states to "maintain a record of every voluntary or involuntary foster care, preadoptive, and adoptive placement of an Indian child and make the record avail- able within

---

[4] In the underlying matter, the Whitney's have a permanency guardianship over the minor children, and have not adopted them, however, the permanency guardianship is the final order in the Tribal Protective Custody matter, thus keeping the Whitney's within the scope of ICWA, and the Penobscot Nation Tribal Court, notwithstanding the fact that they reside in Georgia and have for approximately two (plus) years at the time of the filing of this complaint, as noted in ¶8, *supra*.

14 days of a request by an Indian child's Tribe or the Secretary." 25 C.F.R. § 23.141.

125.     Prior to adopting the Final Rule, Interior and the BIA accepted public comment on the proposed rule. Commenters raised objections to the proposed, now final, rule on the grounds that it violated federalism, the Tenth Amendment, and equal protection principles. *See, e.g.*, 81 Fed. Reg. 38,788–89, 38,794, 38,826. Interior and the BIA dismissed those objections and promulgated the Final Rule. *Id*.

126.     ICWA prohibits a state from asserting jurisdiction over an Indian child, pursuant to the UCCJEA, even when the child is located in a different state from the Tribe.

127.     There is a collateral matter, Civil Action No. 4:17-cv-868-O, in the United States District Court for the Northern District of Texas, Fort Worth Division, that has also dealt with the unconstitutionality of ICWA, alleging the same facts and legal arguments, surrounding situations where adoptions were held up due to the collateral attack provisions of ICWA and the Final rule. *See* Complaint Exhibit A, Attached hereto.

128.     While the underlying facts may be different, the legal arguments apply equally to both cases, the Texas matter as well as the Whitney's.

129.     The Judge in the Texas matter has ruled in favor of the Plaintiffs and determined that ICWA is unconstitutional. *See* Complaint Exhibit B, attached hereto.

130.     The appeal is currently in the Fifth Circuit Court of Appeals, but the Appellants/Defendants motion to stay the District Court's Order pending appeal was denied by the District Court. *See Brackeen, et al. v Zinke, et al.*, 4:17-cv-868-O, ECF 181.

## II.     FACTS RELEVANT TO THE INTERESTS OF PLAINTIFFS

### A.     E.S. and D.S. Permanency Guardianship Proceedings

131.     E.S. and D.S. are considered "Indian children" as that term is defined in the Final Rule

because they are eligible for membership in an Indian tribe, their biological mother being an enrolled member of the Penobscot Nation (the children's biological father is non-native). *See* 25 C.F.R. § 23.2.

132.    The Whitneys restate and incorporate by reference, paragraphs 1 – 8, as though originally stated, herein.

133.    The Whitneys currently have a case pending in the Penobscot Nation Tribal Court, even though they reside in Georgia and have for at least two years now, and have been expected to return to Maine, multiple times for these various hearings, without reimbursement from the Nation.

134.    The allegations made by the biological parents have been investigated and nothing has been substantiated, however, the children have been ordered to be produced, by the Whitneys, at an upcoming trial in the Penobscot Nation Tribal Court, from Georgia, at their expense.

135.    The Penobscot Nation, through its representatives and agents has recently made claims that the children are somehow in a harmful situation because of the religious beliefs of the Plaintiffs and because the children are being raised in that environment, specifically, Attorney Adams made comments referring to the religious preference of the Whitneys and the upbringing of the children in this environment as a basis of concern for the children, in court and on the record.

136.    There have also been comments made by Tribal representatives that have made the Whitneys worry that they are being targeted based on the fact that they are white and non-native.

137.    The Whitneys believe that based on certain other comments that have been made, they are being targeted based on their religious beliefs and their non-native heritage.

138.    There has been a long-term history of the Penobscot Nation investigating allegations of abuse that are made against the PG's, by "others." In each of these prior situations, the allegations go unfounded, including the children denying them; what has been clear during each investigation

is that the Tribe consistently broaches additional "concerns" over the children's connection to the Tribe and their Native history.

139.    Initially the Penobscot Nation, through "Intervenor" status, opposed the termination of the parental rights of the bio-parents, however, the Tribe did not oppose a Permanency Guardianship with the Whitneys; this action on behalf of the Tribe prevented a "clean-break" adoption from occurring.[5]

140.    The Whitneys believe that they are being target as they are white, Jehovah's Witnesses, who are raising the children as Jehovah's Witnesses.

141.    The Whitneys, who reside in Georgia, are being made to continually come back to Maine and incur significant expense, disruption to their daily lives and the daily lives of the children, to endure never ending stress and anxiety over what will come next, and has caused them extreme fear about their parental bond with the children being affected by the actions of the Penobscot Nation; Georgia should have jurisdiction over all children within its borders, regardless of the child's race, religion, color, etc.

142.    At no point in time have the children ever resided at the Penobscot Nation.

143.    The children have expressed the desire to have limited to no contact with the Penobscot Nation based on the continued litigation, including the most recent litigation which is based on allegations that the children have denied, repeatedly, in multiple interviews; the children are unhappy with the continued attacks on their parents, the permanency guardians.

144.    The children do not want to travel to Maine to be forced to testify, but the Guardian *ad Litem* has refused to speak to the children recently, to confirm this information.

---

[5] The Penobscot Nation intervened in the underlying matter, contesting termination of the parents rights over the children, but did support a Permanency Guardianship, therefore, the Whitney's were not able to adopt the children, keeping them forever under the grip of ICWA.

**B.     The Impact of ICWA and the Final Rule on State Plaintiffs**

145.    ICWA and the Final Rule harm State agencies charged with protecting child welfare from coast to coast by usurping lawful authority over the regulation of child custody proceedings and the management of child welfare services. It also jeopardizes millions of dollars in federal funding.

146.    There are four federally recognized tribes exist in Maine, collectively known as the Wabanaki: Maliseet, Micmac, Penobscot and Passamaquoddy.

147.    Given the four federally recognized tribes within Maine's borders, Maine's shared borders with New Hampshire and Canada, and the trend of the peoples of the New England States as well as Canada from frequenting Maine, Maine maintains frequent and ongoing contact with Native Americans.

148.    ICWA and the Final Rule place significant responsibilities and costs on State agencies and courts to carry out federal Executive Branch directives.

149.    Maine OCFS handles Indian child cases every year.

150.    Maine OCFS is authorized to file suits affecting the parent-child relationship, 22 M.R.S.A. 4001 *et seq.*, and in some circumstances take possession of a child with an *ex parte* court order, *see,e.g.*, 22 M.R.S.A. §4034. Moreover, when a child must be removed from their home, the Maine District Court may appoint the Maine OCFS to take "custody" of the child, meaning Maine OCFS is legally responsible for the child's welfare. *See id.* §4036.

151.    ICWA and the Final Rule affect each and every child custody matter handled by Maine OCFS and the Maine courts because they must first determine if the child is an Indian child.

152.    Maine law requires its respective State agencies and courts to act in the best interest of the child in foster care, preadoptive, and adoptive proceedings.

153.    ICWA and the Final Rule replace State Plaintiffs' best-interest-of-the-child standard with

one that mandates racial or ethnic preferences.

154.    Maine prohibits its agencies and courts from using racial preferences in foster care, preadoptive, and adoptive proceedings. *See e.g.* Maine DHHS OCFS Rules Providing for the Licensing of Family Foster Homes for Children, *inter alia*, Ch. 10 – 148, https://www.maine.gov/sos/cec/rules/10/chaps10.htm#148. Federal law also prohibits racial discrimination in adoption or foster care placements, but exempts child custody proceedings covered by ICWA. 42 U.S.C. § 1996b. Maine law exempts ICWA cases from these nondiscrimination rules, but the public policy of Maine is to prohibit racial or ethnic discrimination in foster care placements and adoptions. But for ICWA, Maine's courts would apply nondiscrimination laws to child custody proceedings.

155.    In an adoption and permanency guardianship proceeding, Maine agencies and courts must give preference, in the absence of good cause to the contrary, to placement of an Indian child with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families. 25 U.S.C. § 1915(a).

156.    In a foster care or preadoptive proceeding, Maine agencies and courts give preference, in the absence of good cause to the contrary, to placing the child with (1) a member of the child's extended family; (2) a foster home specified by the Indian tribe; (3) an Indian foster home; or (4) an institution for children approved by the Indian tribe or operated by an Indian tribe. 25 U.S.C. § 1915(b).

157.    ICWA requires Maine's agencies and courts to follow a resolution by the Indian child's tribe to alter the order of preferences related to the child's placement in any foster care or adoption proceeding, even if Maine and the Constitution do not recognize that tribe as an equally footed sovereign deserving full faith and credit. 25 U.S.C. § 1915(c).

158.    ICWA and the Final Rule require Maine's child protective services to undertake additional responsibilities, inquiries, and costs in every child custody matter it handles.

159.    For example, the Maine OCFS has established policies and procedures for compliance with ICWA and the Final Rule. A true and correct copy of the policy and procedure is found at https://www.maine.gov/dhhs/ocfs/cw/policy/iii_-a_-indian-child-welfare-p.html.

160.    OCFS policy requires workers in every abuse or neglect case to determine whether a child or the child's family has Native American ancestry or heritage. If Native American ancestry is claimed, OCFS workers are required to follow specific procedure to ensure compliance with ICWA. *Id.*

161.    Even though ICWA does not apply in every case, Maine OCFS case workers must *inquire* about Native American history in *every* case. *Id*.

162.    Maine OCFS caseworkers must routinely ask families whether they are Native American; document the families' responses; and consult with the attorney representing OCFS and the if the caseworker believes that a case may involve a Native American child. *Id.*

163.    If ICWA applies, the legal burden of proof for removal, obtaining any final order terminating parental rights, and restricting a parent's custody rights is higher; OCFS must serve the child's parent, tribe, Indian custodian, and the BIA with a specific notice regarding ICWA rights, OCFS and its caseworkers must make active efforts to reunify the child and family; the child must be placed according to ICWA statutory preferences; expert testimony on tribal child and family practices may be necessary; and a valid relinquishment of parental rights requires a parent to appear in court and a specific statutory procedure, just to name a few. *Id*.

164.    Maine OCFS case workers are required to: (1) assess possible Indian child status during the initial interview of every child and family it encounters, and every time an additional family

member is located; (2) contact Maine OCFS lawyers regarding possible ICWA cases and consult with them regularly throughout the case; (3) modify removal of custody affidavits to include ICWA information; (4) verify that any foster or adoptive placement follows ICWA's preferences unless the tribe alters those preferences or the court finds good cause not to alter them; (5) send membership query letters to each identified tribe in every Indian child case; (6) send notice of pending custody proceedings involving Indian children to each parent, any Indian custodian, each identified tribe, the Secretary of Interior, and the BIA area director; (7) send notice to the Secretary of Interior and the BIA area director if any parent, custodian, or tribe is unknown or cannot be located; (8) contact the tribe by telephone and fax if OCFS receives no response to the formal notice; (9) file notices with proof of service in the relevant court; (10) make active efforts to preserve the Indian family by conferring with tribal social workers and document the services provided; and (11) consult with OCFS attorneys regarding ICWA requirements for in court procedures.

165.    For example, Maine law requires OCFS to make reasonable efforts in child custody proceedings, but ICWA requires "active efforts." This substantially changes the cost and burden imposed on Maine OCFS. When referring a family or parent to services, reasonable efforts means providing a referral, but leaving the family to seek out assistance on their own, while the active efforts required by ICWA means arranging services and helping families engage in those services.

166.    Maine's courts must notify an Indian child's biological parents, prior Indian custodian, and tribe if a final adoption decree is vacated. 25 C.F.R. § 23.139.

167.    Maine's courts must affirmatively notify the Indian child once he or she reaches age eighteen of his or her tribal affiliation, increasing costs of maintaining records and resources to keep track of children for nearly 20 years of their lives in some cases. 25 C.F.R. § 23.138.

168.    ICWA section 1911(c) and the Final Rule change the rules of civil procedure for Maine

state family courts, by dictating that an Indian child's custodian and the child's tribe must be

granted mandatory intervention.

169.    Maine's agencies and courts must defer to the decisions of the child's Indian tribe when

evaluating membership or eligibility for membership. 25 C.F.R. §§ 108–09.

170.    In a termination of parental rights proceedings, ICWA requires evidence beyond a

reasonable doubt, and requires Maine OCFS to hire expert witnesses at the State's expense. 25

U.S.C. § 1912(f). Maine law require only clear and convincing evidence. *See* 22 M.R.S.A § 4055.

171.    ICWA and the Final Rule purport to override Maine law with respect to when a parent may

voluntarily consent to relinquish parental rights. Maine law permits voluntary relinquishment of

parental rights immediately after birth of the child, *see* 22 M.R.S.A. §4018, but ICWA and the

Final Rule prohibit any consent until 10 days after birth, 25 U.S.C. § 1913(a); 25 C.F.R. §

23.125(e).

172.    ICWA significantly alters how long a final adoption decree may be challenged. Under

ICWA, Maine courts must vacate a final decree of adoption involving an Indian child and return the

child to the parent if the parent of the child withdraws consent to the final adoption decree on the

grounds that the consent was obtained through fraud or duress. The parent may withdraw consent

based on fraud or duress for up to two years after the adoption. 25 U.S.C. § 1913(d); 25 C.F.R. §

23.136. This conflicts directly with Maine law, which provides that an adoption order is subject to

direct or collateral attack one year after the date the order was signed by the court. It also betrays

the Maine common law theory that the best interest of the child is to reach a final child custody

decision so that adoption to a stable home or return to the parents is not unduly delayed.

173.    ICWA permits the invalidation, by another court of competent jurisdiction, of a State

court's final child custody order if a State agency or court did not comply with ICWA. 25 U.S.C. § 1914; 25 C.F.R. § 23.137.

174.     Thus, ICWA requires the Maine's agencies and courts to undertake additional responsibilities, actions, and costs when caring for an Indian child, and provides Indian custodians and tribes additional procedural protections not expressly afforded other parties to the proceedings.

175.     For example, Maine must spend time and money on caseworkers searching for extended family members of the Indian child, contacting those persons, and consulting with them on the case.

176.     Maine also must hire expert witnesses, identified by the Indian child's tribe, to testify in the foster care and termination of parental rights proceedings.

177.     Maine also must spend money transporting Indian children to their parents or Indian custodian, and to their trial homes.

178.     The requirement that Maine maintain records for nearly 20 years in some child custody cases and provide various forms of notification to the federal government and potential ICWA parties, requires additional money and personnel dedicated to compliance.

179.     If Maine fails to comply with ICWA, they would risk losing funding for child welfare services under Title IV-B and Title IV-E of the Social Security Act, which would threaten the elimination of many important social services.

180.     Failure to certify under 42 U.S.C. §§ 622 & 677 that Maine complies with ICWA allows Interior and HHS to withhold or discontinue Title IV-B and Title IV- E funding.

181.     If Maine failed to comply with ICWA, Defendants Bernhardt, LaCounte, Sweeny, and Azar will determine whether these States may continue to receive Title IV-B and Title IV-E funding, which will jeopardize millions of dollars in grants for child welfare, foster care, and

adoption services.

182.    If Maine failed or refused to follow ICWA and the Final Rule, Defendants would bring an action to enforce federal law, as Defendants do on a regular basis. *See, e.g., United States of America v. California*, Case No.: 2:18-cv-00490-JAM-KJN (E.D. Cal.) (pending); *Arizona v. United States*, 567 U.S. 387 (2012); *United States v. Texas*, 457 F.3d 472 (5th Cir. 2006).

183.    To reiterate, Judge Reed O'Connor, of the Northern District of Texas, Fort Worth Division, has ruled ICWA to be unconstitutional. *See* Complaint Exhibit B.

## CLAIMS ALLEGED BY PLAINTIFFS

### COUNT I
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
**(Not in Accordance with Law – Equal Protection, Tenth Amendment, Article I)**

184.    Plaintiffs incorporate previous paragraphs as if fully restated here.

185.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

186.    The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). The Final Rule is not in accordance with law for a number of independent reasons.

187.    The Final Rule violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq*., violates the individual plaintiffs' and citizens of State Plaintiffs' equal protection rights under the Fifth Amendment of the United States Constitution. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). The Final Rule imposes a naked preference for "Indian families" over families of any other race; the Final Rule puts non-Indian families who wish to adopt an "Indian child" to the extraordinary burden of demonstrating good

cause to depart from the placement preferences by clear and convincing evidence, while any Indian family would enjoy a presumption that the adoption is in the child's best interests. The Final Rule's classification of Indians and non-Indians, and its discrimination against non- Indians, is based on race and ancestry and violates the constitutional guarantee of equal protection.

188.    The Final Rule further violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq.*, unlawfully discriminates against "Indian children" (as defined by the Final Rule) in violation of the Constitution's guarantee of equal protection, by subjecting them to a heightened risk of a placement that is contrary to their best interests and based solely on their race and ancestry. Under Maine's laws, a child's placement generally will be made in accordance with his or her best interests. But the Final Rule's placement preferences, its new restriction on evidence that can be considered as a part of an analysis of "good cause" for departing from those preferences, and the new regulation providing that good cause should be shown by clear and convincing evidence combine to substantially increase the risk that an Indian child will be placed in accordance with the placement preferences even when that placement would be contrary to his best interests. This burden applies to Indian children solely because of their or their parents' membership in an Indian tribe—eligibility that often turns on blood quantum. The Final Rule thus discriminates against Indian children in State child custody proceedings in violation of equal protection principles under the Fifth Amendment.

189.    The Final Rule further violates the APA because the adoption and foster care and pre-adoptive placement of "Indian children"—the topics regulated by the unit of the Final Rule entitled "Dispositions," 25 C.F.R. § 23.129 *et seq.*,—are not permissible subjects of regulation under the Tenth Amendment. The Final Rule claims that federal regulation of the placement of Indian children is authorized by the Indian Commerce Clause. *See* 81 Fed. Reg. at 38,789; *see also* 25

U.S.C. § 1901(1). But children are not articles of commerce, nor can their placement be said to substantially affect commerce with Indian nations. *See Adoptive Couple*, 133 S. Ct. at 2566–70 (Thomas, J., concurring). The Final Rule therefore is not a valid exercise of federal authority and is unconstitutional.

190.    The Final Rule further violates the APA because the provisions concerning post- adoption collateral attacks, 25 C.F.R. §§ 23.136, 23.137, violate the Plaintiffs', citizens of Maine, and Indian children's equal protection rights under the Fifth Amendment of the United States Constitution. The Final Rule subjects the adoption of an "Indian child" to a period of collateral attack of not less than two years, overriding state laws that provide for shorter periods to attack a voluntary adoption, and thereby disadvantages Indian children and the families that adopt Indian children. This discrimination against Indian children and those that adopt them is based on race and ancestry and violates the constitutional guarantee of equal protection.

191.    The Final Rule further violates the APA because the Final Rule regulates the placement of Indian children not directly, but through States' governments in violation of the Tenth Amendment. The Final Rule makes this plain when it purports to issue minimum federal standards for "placement of an Indian child *under State law*." 25 C.F.R. §§ 23.130(a), 23.131(a) (emphasis added). And it is not just the portion of State Plaintiffs' child custody regulatory regime administered by state courts that the Final Rule commandeers. The Final Rule also demands that Maine apply the placement preferences in foster care and pre-adoptive placements, which, in Maine at least, are administered in part by Maine's agencies. Even when Congress has power to regulate under one of its enumerated powers, the federal government cannot require a State agency or official to administer a federal regulatory program. *United States v. Printz*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address

particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."). The Final Rule thus violates the anti-commandeering principle under the Tenth Amendment and is unconstitutional.

192.    The Final Rule further violates the APA because the Final Rule delegates to Indian tribes the legislative and regulatory power to pass resolutions in each Indian child custody proceeding that alter the placement preferences state courts must follow in violation of Article I of the Constitution. The Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. 1, § 1. The Constitution authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers. U.S. Const. art. 1, § 8. The Constitution bars Congress and the BIA from delegating to others the essential legislative and administrative functions with which they are vested. The Final Rule thus violates the non-delegation doctrine of Article I, Section 1 of the Constitution and is unconstitutional.

193.    The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The Final Rule is arbitrary and capricious agency action for a number of reasons, including that it is an unexplained and unsupported departure from the position adopted in the 1979 Guidelines and held by the defendants for nearly forty years.

194.    The Final Rule further violates the APA because its provision that "[t]he party seeking departure from the placement preferences should bear the burden of proving by clear and convincing evidence that there is 'good cause' to depart from the placement preferences," 81 Fed. Reg. at 38,874 (codified at 25 C.F.R. § 23.132(b)), is contrary to Section 1915 of ICWA and is arbitrary and capricious.

195.    The Final Rule further violates the APA in that its limitation on the evidence that may be

considered in the analysis of "good cause," *see* 25 C.F.R. § 23.132(c)–(e), is contrary to Section 1915 of ICWA and is arbitrary and capricious.

196.     The Whitneys are directly, personally, and substantially injured by ICWA's collateral attack provisions, 25 U.S.C. §§ 1913(d), 1914, and the provisions of the Final Rule purporting to implement those provisions, 25 C.F.R. §§ 23.136, 23.137, because they subject the Whitney family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law. The Whitneys are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the issues that the Whitneys have already endured with any future foster or adoptive children.

197.     Plaintiffs have no adequate remedy at law to redress the burdens now being imposed by Final Rule because claims arising under the APA cannot be litigated in State courts.

198.     This Court should declare the Final Rule invalid and set it aside.

**COUNT II**
**VIOLATION OF ARTICLE I OF THE CONSTITUTION**
**(Commerce Clause)**

199.     Plaintiffs incorporate previous paragraphs as if fully restated here.

200.     The Commerce Clause of the United States Constitution provides: "The Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

201.     At the time the original Constitution was ratified, commerce consisted of selling, buying, and bartering, as well as transporting for these purposes. *See Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring).

202.     At the time the original Constitution was ratified, the Indian Commerce Clause was intended

to include "trade with Indians." *See Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring).

203.    The Indian Commerce Clause provides Congress with the power to regulate commerce with Indian tribes, but not any Indian person. *See Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring).

204.    ICWA locates Congress's authority for the statute in the Indian Commerce Clause. *See* 25 U.S.C. § 1901(1).

205.    Children are not articles of commerce, nor can their placement be said to substantially affect commerce with Indian nations. *See Adoptive Couple*, 133 S. Ct. at 2566–70 (Thomas, J., concurring).

206.    No other enumerated power supports Congress's intrusion into this area of traditional state authority.

207.    ICWA Sections 1901–1923 and 1951–1952 are therefore unconstitutional under the Commerce Clause of Article I.

**COUNT III**
**VIOLATION OF THE TENTH AMENDMENT**
**(Domestic Relations & Anti-Commandeering)**

208.    Plaintiffs incorporate previous paragraphs as if fully restated here.

209.    The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

210.    ICWA Sections 1901–1923 and 1951–1952 are not permissible subjects of regulation under the Tenth Amendment.

211.    ICWA's provisions concerning the adoption and foster care and preadoptive placement of

"Indian children" are not permissible subjects of regulation under the Tenth Amendment.

212.     Since the adoption of the Constitution, family law and domestic relations have been regarded as being within the virtually exclusive province of the States. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975); *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 383–84 (1930).

213.     Adoption proceedings are adjudicated exclusively in state family courts.

214.     Foster care and pre-adoptive placements also are administered exclusively by States; in Maine, by the OCFS.

215.     ICWA locates Congress's authority for the statute in the Indian Commerce Clause.

216.     25 U.S.C. § 1901(1). The Indian Commerce Clause grants Congress the authority "[t]o regulate commerce . . . with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

217.     Children are not articles of commerce, nor can their placement be said to substantially affect commerce with Indian nations. *See Adoptive Couple*, 133 S. Ct. at 2566–70 (Thomas, J., concurring).

218.     No other enumerated power supports Congress's intrusion into this area of traditional state authority.

219.     ICWA's provisions concerning the adoption and foster care and pre-adoptive placement of "Indian children" are unconstitutional under the Tenth Amendment because they regulate the placement of Indian children not directly, but through state governments. Even when Congress has power to regulate under one of its enumerated powers, the federal government cannot require a State agency or official to administer a federal regulatory program. *United States v. Printz*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").

220.    ICWA thus violates the anti-commandeering principle under the Tenth Amendment and is unconstitutional.

221.    ICWA impermissibly commands state governments to administer adoptions and foster care and preadoptive placements according to Congress's instructions. Here, ICWA commands the state family courts to transfer jurisdiction to an Indian Tribe, and further prohibits a State from exercising jurisdiction over a family or a child pursuant to the UCCJEA. ICWA impermissibly commandeers state governments and therefore is unconstitutional.

222.    ICWA Sections 1911, 1912, and 1913, and the Final Rule alter the content of State Plaintiffs' laws by requiring their courts to apply federal substantive rules of decision and federal procedural requirements in state law causes of action that result in state law judgments that form part of the corpus of state law.

223.    ICWA Section 1911 impermissibly alters State Plaintiffs' rules of procedure for foster care placement and termination of parental rights proceedings with federal rules of decision. ICWA grants an Indian custodian of a child and the child's tribe mandatory intervention at any point in the proceedings.

224.    ICWA Section 1912 and the Final Rule increase the standard for termination of parental rights for an Indian child to "evidence beyond a reasonable doubt" and demand expert witness testimony.

225.    ICWA Section 1913 and the Final Rule impermissibly command state governments and courts to change their laws and rules respecting when and how a parent of an Indian child or Indian custodian may give voluntary consent to foster care placement or termination of parental rights.

226.    ICWA Section 1913 also impermissibly commands state courts to allow for revocation of voluntary termination of parental rights any time prior to the final decree of termination.

227.    The Final Rule dictates what State Plaintiffs' agencies and courts must do in cases of emergency removal or placement of an Indian child.

228.    The Final Rule prohibits Maine's agencies and courts from making a determination as to an Indian child's membership status with a tribe. Maine must defer to the membership determination of the tribe.

229.    The Final Rule commands Maine courts to allow the invalidation of child custody proceeding final orders for up to two years, which is twelve months beyond what is permitted under Maine laws.

230.    ICWA requires Maine's agencies and courts to undertake administrative actions of the federal government.

231.    ICWA Sections 1911 and 1912 and the Final Rule require state agencies and courts to notify potential intervenors about a proceeding, send copies of the notices to Defendants, and suspend proceedings for at least 10 days.

232.    The Final Rule commands state government agencies and state courts to inquire about Indian child status throughout child custody proceedings.

233.    ICWA Section 1912 and the Final Rule require Maine's OCFS to use "active efforts" to prevent the breakup of an Indian family.

234.    The Final Rule requires Maine courts to confirm that Maine's agencies used "due diligence" to work with all of the tribes in which the child may be a member and conducted a "diligent search" for tribal placement of the child.

235.    ICWA Sections 1915, 1917, and 1951 and the Final Rule demand that Maine's agencies and courts collect information and perform recordkeeping functions for the federal government for child custody proceedings involving Indian children.

236.    Social Security Act Sections 622(b)(9) and 677(b)(3)(G) commandeer States by requiring them to comply with all aspects of ICWA to receive federal funding.

237.    ICWA is unconstitutional under the Tenth Amendment for the additional reason that it violates the equal footing doctrine and the Full Faith and Credit Clause of the Constitution.

238.    The Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const., art. IV, § 1. The "Full Faith and Credit Clause does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.'" *Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488, 494 (2003) (citations omitted).

239.    The Full Faith and Credit Clause extends only between States, not States and Indian tribes. *Wilson v. Marchington*, 127 F.3d 805 (9th Cir. 1997). "The equal footing clause has long been held to refer to political rights and to sovereignty. The requirement of equal footing was designed not to wipe out those diversities but to create parity as respects political standing and sovereignty." *United States v. Texas*, 339 U.S. 707, 716 (1950) (internal citations and quotation marks omitted).

240.    ICWA demands that State Plaintiffs and other States defer to the resolutions of tribes altering the ICWA placement preferences for Indian children, even though those tribes are not on equal footing with the States and do not deserve full faith and credit under Article IV.

241.    The Final Rule requires Maine's agencies and courts to transfer child custody matters to tribal courts when the Indian parent, custodian, or tribe requests it, even though those tribes are not on equal footing with the States and do not deserve full faith and credit under Article IV.

242.    ICWA is unconstitutional for the additional reason that it violates the Guarantee Clause of Article IV, Section 4 of the Constitution, which guarantees to every State a republican form of government. The Guarantee Clause provides that Congress many not interfere with states'

autonomy to such an extent that it prevents them from enjoying untrammeled self-government. States are "endowed with all the functions essential to separate and independent existence." *Lane Cty. v. Oregon*, 74 U.S. 71, 76 (1868). A separate and independent state judiciary is an indispensable element of a republican form of government that Congress may not invade.

243.   Maine's courts adjudicate family law and domestic relations cases, including child custody proceedings. ICWA violates the Tenth Amendment by removing the guarantee that Maine provide a republican form of government to its citizens, including an independent judiciary that may develop its own substantive law within the areas of responsibility granted it by the United States Constitution and Maine's constitutions.

244.   The Whitneys are directly, personally, and substantially injured by ICWA's exclusive jurisdiction section, 25 U.S.C. §1911, the provisions of the Final Rule purporting to implement that provisions, 25 C.F.R. §23.115 *et seq*, because they subject the Whitney family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under State law, as they are forever required to be made to travel to Maine, the moment anyone files paperwork in the Penobscot Nation Tribal Court, regardless of the merits of the filings.

245.   The Whitneys are directly, personally, and substantially injured by ICWA and the Final Rule purporting to implement ICWA, because they subject the Whitney family to ongoing jurisdiction over them, as well as continual attacks on their religious beliefs and non-native heritage, by the Penobscot Nation Tribal Court, when the Whitney's do not reside in Maine, nor have they for multiple years now, which is contrary to State Law.

246.   Plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

247.   Plaintiffs thus seek a declaration that Sections 1901–1923 and 1951–1952 of ICWA violate

the Tenth Amendment and are unconstitutional and unenforceable, and an injunction barring the

Defendants from implementing or administering that provision by regulation, guideline, or

otherwise.

## COUNT IV
## VIOLATION OF THE FIFTH AMENDMENT
### (Equal Protection)

248.     Plaintiffs incorporate previous paragraphs as if fully restated here.

249.     The Due Process Clause of the Fifth Amendment mandates the equal treatment of people

of all races without discrimination or preference. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954).

250.     ICWA defines an "Indian child" as an "unmarried person who is under age eighteen and is

either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the

biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

251.     ICWA classifies E.S. and D.S. as "Indian children."

252.     ICWA classifies many children in Maine's custody and care as Indian children.

253.     The Whitneys are not "Indian families" within the meaning of ICWA.

254.     Many prospective foster parents and adoptive parents in Maine are not "Indian families"

within the meaning of ICWA.

255.     ICWA's placement preferences applicable to an adoption or preadoptive placement of an

"Indian child," 25 U.S.C. § 1915(a)–(b), impose a naked preference for "Indian families" over

families of any other race and puts non-Indian families who wish to adopt an "Indian child" to the

burden of demonstrating good cause to depart from the placement preferences, while any Indian

family would enjoy a presumption that the adoption or preadoptive placement is in the child's best

interests. ICWA's classification of Indians and non-Indians, and its discrimination against non-

Indians, is based on race and ancestry and violates the constitutional guarantee of equal protection.

256.    The Whitneys are directly, personally, and substantially injured by ICWA's exclusive jurisdiction section, 25 U.S.C. §1911, the provisions of the Final Rule purporting to implement that provisions, 25 C.F.R. §23.115 *et seq*, because they subject the Whitney family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under State law, as they are forever required to be made to travel to Maine, the moment anyone files paperwork in the Penobscot Nation Tribal Court, regardless of the merits of the filings.

257.    The Whitneys are directly, personally, and substantially injured by ICWA and the Final Rule purporting to implement ICWA, because they subject the Whitney family to ongoing jurisdiction over them, as well as continual attacks on their religious beliefs and non-native heritage, by the Penobscot Nation Tribal Court, when the Whitney's do not reside in Maine, nor have they for multiple years now, which is contrary to State Law.

258.    Plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

259.    Plaintiffs thus seek a declaration that Sections 1911(a), 1915(a) and 1915(b) of ICWA violate principles of equal protection and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering that provision by regulation, guide-line, or otherwise.

**COUNT V**
**VIOLATION OF THE FIFTH AMENDMENT**
**(Due Process—ICWA § 1911)**

260.    Plaintiffs incorporate previous paragraphs as if fully restated here.

261.    The United States has a deeply rooted tradition of honoring intimate family relationships. The Whitney's possess a fundamental right of liberty to intimate familial relationships.

262.    ICWA places permanent restrictions on the States' abilities to take jurisdiction over certain

children residing in that state, when moving from a prior state where the children's tribe is located, violating state laws and interfering with the parental relationship of the children.

263.    The Whitney's intimate familial relationship with the children is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest.

264.    Directing a state to exempt Indian children from the jurisdictional requirements of the UCCJEA is not narrowly tailored to any important government interest.

265.    The Whitneys are directly, personally, and substantially injured by ICWA's exclusive jurisdiction section, 25 U.S.C. §1911, the provisions of the Final Rule purporting to implement that provisions, 25 C.F.R. §23.115 *et seq*, because they subject the Whitney family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under State law, as they are forever required to be made to travel to Maine, the moment anyone files paperwork in the Penobscot Nation Tribal Court, regardless of the merits of the filings.

266.    The Whitneys are directly, personally, and substantially injured by ICWA and the Final Rule purporting to implement ICWA, because they subject the Whitney family to ongoing jurisdiction over them, as well as continual attacks on their religious beliefs and non-native heritage, by the Penobscot Nation Tribal Court, when the Whitney's do not reside in Maine, nor have they for multiple years now, which is contrary to State Law.

267.    The plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

268.    The plaintiffs thus seek a declaration that Section 1911 of ICWA violates principles of substantive due process and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering those provisions by regulation, guideline, or

otherwise.

## COUNT VI
## VIOLATION OF ARTICLE I OF THE CONSTITUTION
### (Non-Delegation Doctrine)

269.    Plaintiffs incorporate previous paragraphs as if fully restated here.

270.    The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. 1, § 1.

271.    The Constitution authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers. U.S. Const. art. 1, § 8, cl. 18.

272.    The Constitution bars Congress from delegating to others the essential legislative functions with which it is vested.

273.    ICWA Section 1915(c) and the Final Rule Section 23.130(b) delegate to Indian tribes the legislative and regulatory power to pass resolutions in each Indian child custody proceeding that alter the placement preferences state courts must follow.

274.    The Final Rule prohibits Maine's agencies and courts from making a determination as to an Indian child's membership status with a tribe. Maine must defer to the membership determination of the tribe.

275.    Plaintiffs are directly and substantially injured by the delegation of power over placement preferences because it violates the Constitution's separation of powers through abdication of Congress's legislative responsibility and requires Maine to honor the legislation and regulation passed by tribes in each child custody matter, which can vary widely from one child to the next and one tribe to another.

276.    Plaintiffs have no adequate remedy at law to redress the injuries they are suffering under

ICWA.

277.    Plaintiffs thus seek a declaration that ICWA Section 1915(c) and Final Rule Section 23.130(b) violate Article I, sections 1 and 8, and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering those provisions by regulation, guideline, or otherwise.

## COUNT VII
## VIOLATION OF THE FIRST AMENDMENT
### (Religious Freedom)

278.    Plaintiffs incorporate previous paragraphs as if fully restated here.

279.    Defendants have claimed that the Plaintiffs' religious beliefs and preferences as Jehovah's Witnesses, and the children's upbringing within that religion, has had some negative effect on them.

280.    The Penobscot Nation, through its representatives and agents, has claimed as much in open Tribal Court.

281.    The Penobscot Nation has made claims and taken actions against the Plaintiffs and their agent, about their non-native heritage.

282.    The Penobscot Nation has engaged in a course of conduct aimed at the Plaintiffs and their agent based on the Plaintiff's non-native heritage and their religious beliefs.

283.    It is deeply rooted in the United States Constitution that no State shall infringe upon the religious beliefs of any citizen. U.S. Const. Amend. I. Indian Tribes are considered a sovereign entity (*to wit* a state).

284.    As a result, the Plaintiffs have been harmed and substantially inured.

285.    Plaintiffs seek a permanent injunction against the Penobscot Nation, requiring it to cease and desist from any further discriminatory conduct towards the Plaintiffs or their agents, based on

their religious beliefs or their heritage and for a declaratory judgment that ICWA and the Final Rule implementing it are unconstitutional.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

1.     Declare that the Final Rule violates the APA, hold it invalid, and set it aside;

2.     Issue a declaratory judgment that ICWA, 25 U.S.C. §§ 1901–1923, 1951–1952, is unconstitutional and unenforceable;

3.     Issue a declaratory judgment that Sections 1911, 1912, 1913(d), 1914, and 1915 of ICWA are unconstitutional and unenforceable;

4.     Issue a declaratory judgment that 42 U.S.C. §§ 622(b)(9) and 677(b)(3)(G) are unconstitutional and unenforceable.

5.     Issue an injunction prohibiting Defendants from implementing or administering 25 U.S.C. §§ 1901–1923, 1951–1952 by regulation, guidelines, or otherwise;

6.     Issue an injunction prohibiting Defendants from implementing or administering Sections 1911, 1912, 1913(d), 1914, 1915 of ICWA by regulation, guidelines, or otherwise;

7.     Issue an injunction prohibiting Defendants from implementing or administering 42 U.S.C. § 622(b)(9) and 677(b)(3)(G) by regulation, guidelines, or otherwise;

8.     Award Plaintiffs costs and reasonable attorneys' fees as appropriate; and

9.     Grant such further and other relief as this Court deems just and proper.

Dated at Bangor, Maine
June 27, 2019

     /s/ Ezra A. R. Willey, Esq.
Ezra A. R. Willey, Esq. (#5025)
Attorney for Plaintiff
WILLEY LAW OFFICES
15 Columbia St., Ste. 501
P. O. Box 924
Bangor, ME 04402-0924
(207) 262-6222
ezra@willeylawoffices.com